# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-06-00583-CV

**Pifi Constancio, Individually and on behalf of The Estate of
Ruben Constancio, Deceased, Appellant**

**v.**

**James Bray, M.D., Appellee**

**FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 119TH JUDICIAL DISTRICT
NO. B-06-0157-C-1, HONORABLE THOMAS J. GOSSETT, JUDGE PRESIDING**

## D I S S E N T I N G   O P I N I O N

The expert report requirement for health-care liability claims serves a gatekeeping function designed to promptly identify frivolous lawsuits while preserving meritorious claims. At this early stage in the proceedings, the key concerns are identifying the specific conduct at issue and demonstrating the expert's opinions have a sound basis. The standards are "objective good faith" and "fair summary of the expert's opinions." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*), (r)(6) (West Supp. 2008). Because the second expert report served by appellant in this case meets those standards, I would reverse the trial court's order granting Dr. Bray's motion to dismiss. For this reason, I respectfully dissent.

**FACTUAL AND PROCEDURAL BACKGROUND**

On February 3, 2006, appellant filed suit against Shannon West Texas Memorial Hospital and Dr. James Bray, alleging that they negligently caused the death of her husband, Ruben Constancio. According to appellant's petition, Mr. Constancio suffered a cardiorespiratory arrest on December 1, 2003; he was resuscitated and his vital signs were restored, but he never recovered and was pronounced dead on December 13, 2003. Only the claims against Dr. Bray are currently before this Court. Appellant alleged that Dr. Bray, who treated Mr. Constancio on November 30, 2003 and December 1, 2003, was negligent in (i) ordering Ativan, morphine and Phenergan[1] to be administered to Mr. Constancio in the face of respiratory distress; (ii) not coming in to evaluate the patient in the face of respiratory distress and deterioration; and (iii) decreasing the frequency of nursing assessments and vital sign checks in the face of respiratory distress and deterioration.

On the same date appellant filed suit, she served the expert report and curriculum vitae of Dr. J. Steven Hata, a triple board-certified physician who serves as director of the Surgical Intensive Care Unit at the University of Iowa College of Medicine. *See id.* § 74.351(a) (requiring claimant in health care liability case to file expert report and curriculum vitae within 120 days of filing suit). Dr. Bray filed a motion objecting to the adequacy of the expert report on February 22 (19 days after Dr. Hata's report was served). *See id.* (requiring defendant whose conduct is implicated in report to file and serve any objections to report's sufficiency within 21 days after report

---

[1] In her first-amended petition, appellant contends that these three drugs cause respiratory depression to some degree and "in combination they can synergistically significantly increase respiratory depression."

was served).  In response, appellant asserted that the expert report was adequate and that the motion should be denied, but requested, in the alternative, that the court grant a 30-day extension in which to cure any defects in the report.  The court held a hearing on Dr. Bray's motion on May 5 (96 days after the original report was served) and found that Dr. Hata's expert report did not sufficiently address the standard of care applicable to Dr. Bray or causation.  The court therefore granted Dr. Bray's motion, but also granted appellant's request for a 30-day extension, with the extension to run from that date, May 5.

On May 30 (day 116), appellant filed an amended report from Dr. Hata.  Dr. Bray filed a motion to dismiss asserting that this second report also was inadequate.  *See id.* § 74.351(b)-(c) (mandating dismissal with prejudice for failing to serve expert report within 120-day period unless court grants one-time, 30-day extension).  Appellant filed a response and again requested an extension.  The trial court found that the second report failed to adequately address causation and therefore granted Dr. Bray's motion to dismiss.  The court also denied appellant's request for an extension.

***The expert report requirement***

In a health-care liability claim, the claimant must provide each defendant with one or more expert reports, including a curriculum vitae for each expert, within 120 days of filing the original petition.  *Id.* § 74.351(a).  An "expert report" is:

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the

standards, and the causal relationship between the failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6).  A report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute.  *American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001).  To constitute a good faith effort, the report must inform the defendant of the specific conduct called into question and provide a basis for the trial court to determine that the claims have merit.  *Id.* at 879.  A report does not fulfill these two purposes if it fails to address the standard of care, breach of the standard, and causation, or if it merely states the expert's conclusions regarding these elements.  *Id.*  The expert must explain the basis of his statements to link his conclusions to the facts.  *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)).

### Dr. Hata's second report

Appellant filed three reports from Dr. Hata.  At issue on appeal is the adequacy of the second report, which was filed on May 30, 2006.  That report begins with a summary of Dr. Hata's qualifications and then recounts the medical care Mr. Constancio received after he was admitted to the hospital on November 29, 2003, with "complaints of cough, cold symptoms, abdominal pain, and delirium":

> On 11/30/03 Dr. Bray reported that the patient was mildly agitated. . . . He stated that agitation might be secondary to pain.  At 0100 he ordered wrist restraints.  At 0145

4

Mr. Constancio showed a pulse oximetry[2] reading of 84-85% on room air. At 0405 hours Dr. Bray ordered nebulized bronchodilators. Nursing notes report coarse respiratory sounds. At 0503 hours Dr. Bray decreased vital sign monitoring from every one hour to every 4 hours. At 0830 hours he ordered Phenergan, Ativan, and morphine orally or intravenously on an as necessary basis. At 1400 hours Dr. Bray ordered Haldol 10 milligrams IV. Nursing notes at 2000 hours report that the patient was in a supine position, "thrashing around agitated", with coarse breaths bilaterally. Mr. Constancio's Glasgow score decreased from 15 to 12 by 2300 hours.

On 12/1/03 at 0040 Mr. Constancio showed tachypnea with a respiratory rate of 32 with bilateral wheezes with a heart rate of 102. No pulse oximetry was reported. His nurse reports that he was agitated at 0145 hours. There was no report of pain, nausea, or anxiety. The nurse . . . injected lorazepam 0.5 mg IV, morphine 2.0 mg IV, and Phenergan 25 mg IV, all at 0145 hours into Mr. Constancio. There are no vital signs written at this time or pulse oximetry. At 0230 hours, Mr. Constancio was reportedly asleep. Mr. Constancio coded at 0340 hours. He required intubation and mechanical ventilation. He was then admitted to the ICU and treated with broad-spectrum antibiotics. Blood cultures were positive for methicillin resistant Staphylococcus aureus. Chest x-ray showed chest infiltrates suggestive of pulmonary edema.

The patient showed no responsiveness after the event. Dr. Chang[3] stated that findings were consistent [with] anoxic encephalopathy.[4] The patient died on 12/13/03.

The report next lists six actions the standard of care applicable to Dr. Bray allegedly required:

Based upon the medical condition of Mr. Constancio [and] based upon the medical record, the standard of care for Dr. Bray would have required:

---

[2] A pulse oximeter is a device that measures the oxygen saturation of arterial blood. *Dorland's Illustrated Medical Dictionary* 1343 (Douglas M. Anderson chief lexicographer, 30th ed. 2003) [hereinafter *Dorland's*].

[3] Appellant's first amended petition states that Mr. Constancio was a patient of Dr. Chang, but that Dr. Bray was Dr. Chang's "covering partner" on November 30, 2003, and December 1, 2003.

[4] Anoxic encephalopathy is synonymous with hypoxic encephalopathy, which is a degenerative disease of the brain caused by hypoxia from either decreased rate of blood flow or decreased oxygen content of arterial blood. *Dorland's*, *supra* note 2, at 610-11.

(1) Re-evaluation of the increasingly disoriented patient on 11/30/03 and 12/1/03 by going to the patient's bedside, listen[ing] to the lungs with a stethoscope and performing a neurologic examination;

(2) obtain current blood studies of his glucose level to monitor for diabetic ketoacidosis with blood tests;

(3) monitor continuous oxygen saturation levels with the use of pulse oximetry recorded at least every 15 minutes;

(4) increase, rather than decrease, the frequency of monitoring vital signs (blood pressure; pulse; respirations; and blood oxygen saturation);

(5) admit Mr. Constancio to ICU for intensive monitoring;

(6) place Mr. Constancio on supplemental oxygen.

The report then states that Dr. Bray deviated from the standard of care because he failed to take each of the six actions listed. The report ends with a two-paragraph discussion titled "Causation":

> Had Dr. Bray complied with the standard of care, within reasonable medical probability, Mr. Constancio would not have died when he did. Closer evaluation on 11/30/03 and 12/1/03 would have led Dr. Bray to recognize that Mr. Constancio's agitation was not a response to pain, but a symptom of hypoxemia.[5] Hypoxia[6] probably caused this patient to become agitated. This is confirmed with a pulse oximetry reading of 84-85%. Pulse oximetry at this level in this patient is significantly abnormal and indicates hypoxemia.
>
> In the face of these changes, Dr. Bray reduced Mr. Constancio's monitoring schedule. Had Dr. Bray admitted Mr. Constancio to the Intensive Care Unit, Mr. Constancio would have received constant monitoring and his hypoxic condition would have been, in reasonable medical probability, recognized by the nursing staff and alerted Dr. Bray. The standard of care at that point in time would be for Dr. Bray to put Mr. Constancio on supplemental oxygen or a ventilator; treat the diabetic

---

[5] Hypoxemia is deficient oxygenation of the blood. *Dorland's*, *supra* note 2, at 900.

[6] Hypoxia is a reduction of oxygen supply to tissue below physiological levels despite adequate perfusion of the tissue by blood. *Id.*

ketoacidosis by lowering his blood glucose, and he would have recognized the combination effects of the medications given and reversed those with medical support in the Intensive Care Unit. Had this been done, Mr. Constancio would not have, in reasonable medical probability, died during that hospitalization, and would have, in reasonable medical probability, recovered and been discharged. Diagnosis would be community acquired pneumonia and diabetic ketoacidosis, the majority of patients with this diagnosis survive if reasonable care is provided.

## ANALYSIS

On appeal, appellant contends that (1) the trial court erred in granting Dr. Bray's motion to dismiss because Dr. Hata's second report was sufficient, and (2) the trial court erred in granting an extension of time that was not in conformance with the statutory 30-day extension provided by section 74.351(c). *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c).

### *Standard of review*

We review a trial court's ruling on a motion to dismiss under section 74.351(b) for an abuse of discretion. *See Palacios*, 46 S.W.3d at 877-78. We also review a trial court's order granting or denying a 30-day extension to cure an expert report using an abuse of discretion standard. *Ogletree v. Matthews*, No. 06-0502, 2007 Tex. LEXIS 1028, at *10 (Tex. 2007). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Walker v. Gutierrez*, 111 S.W.3d 56, 63 (Tex. 2003).

7

*The motion to dismiss*

A report may be held inadequate as to causation only if it does not constitute an objective good faith effort to provide a fair summary of the expert's causation opinions. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*), (r)(6). The supreme court addressed the adequacy of an expert report's discussion of causation under the former expert report statute in *Bowie Memorial Hospital*, 79 S.W.3d at 48. In that case, the court upheld a trial court's determination that an expert report failed to adequately address causation. *Id.* at 53. The report included only one statement addressing causation: "I do believe that it is reasonable to believe that if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then [the plaintiff] would have had the possibility of a better outcome." *Id.* at 51. The court concluded that, because the report lacked "information linking the expert's conclusion (that [the plaintiff] would have had 'the possibility of a better outcome') to [the defendant's] alleged breach (that it did not correctly read and act upon the x-rays), the trial court could have reasonably determined that the report was conclusory." *Id.* at 53. The court stated that, "while the expert report does not need to marshal all the evidence necessary to establish causation at trial, it must contain sufficiently specific information to demonstrate causation beyond mere conjecture." *Id.* at 52.

Relying on *Bowie Memorial Hospital*, 79 S.W.3d at 51, the majority concludes that Dr. Hata's second report did not adequately "indicate" and state what "ultimately" caused Mr. Constancio's death. I disagree. The statements in Dr. Hata's report are distinguishable from the conclusory statements at issue in those cases cited by the majority. While the initial statement alone in Dr. Hata's report addressing causation—"Had Dr. Bray complied with the standard of care,

8

within reasonable medical probability, Mr. Constancio would not have died when he did"—is conclusory, Dr. Hata's report goes further. As the majority recognizes, the report clearly ties Dr. Bray's failure to re-evaluate or more closely evaluate Mr. Constancio on November 30 and December 1 to Dr. Bray's failure to diagnose hypoxemia. The report states that such evaluation "would have led Dr. Bray to recognize that Mr. Constancio's agitation was not a response to pain, but a symptom of hypoxemia." This conclusion is tied to the facts by the statements that (1) "[h]ypoxia probably caused this patient to become agitated;" (2) "[t]his is confirmed with a pulse oximetry reading of 84-85%;" and (3) "[p]ulse oximetry at this level in this patient is significantly abnormal and indicates hypoxemia."

Similarly, the report ties the decrease in monitoring vital signs and the failure to admit Mr. Constancio to the ICU for intensive monitoring to the failure to diagnose hypoxemia. The report states that, "[i]n the face of these changes [i.e. significantly abnormal pulse oximetry and agitation likely due to hypoxia], Dr. Bray reduced Mr. Constancio's monitoring schedule. Had Dr. Bray admitted Mr. Constancio to the Intensive Care Unit, Mr. Constancio would have received constant monitoring and his hypoxic condition would have been, in reasonable medical probability, recognized by the nursing staff and alerted Dr. Bray."

The report's next statement lists the actions that should have been taken after recognizing hypoxemia—putting Mr. Constancio on supplemental oxygen or a ventilator, lowering his blood glucose to treat his diabetic ketoacidosis, and recognizing and reversing the combination

9

effects[7] of the medications given. The report then states that "[h]ad this been done, Mr. Constancio would not have, in reasonable medical probability, died during that hospitalization, and would have, in reasonable medical probability, recovered and been discharged." Viewed in isolation, this sentence would seem conclusory. However, this statement is tied to the previously mentioned three actions Dr. Hata states should have occurred after recognizing hypoxemia. It is also linked to the subsequent sentence, which states that the "[d]iagnosis would be community acquired pneumonia and diabetic ketoacidosis, [and] the majority of patients with this diagnosis survive if reasonable care is provided." Dr. Hata's final sentence clarifies that he believes Mr. Constancio had community acquired pneumonia and diabetic ketoacidosis, but that Mr. Constancio would not have died from those conditions had he received reasonable care.

The majority faults the report for failing to make an additional link that ties the failure to diagnose Mr. Constancio's hypoxemia to his ultimate death. According to the majority, Dr. Hata's report fails to make this final link because he mentions several medical conditions but never expressly states from what Mr. Constancio died. Dr. Hata's report, however, states that Mr. Constancio "showed no responsiveness" after he coded and that "Dr. Chang stated that the findings were consistent [with] anoxic encephalopathy," which is a degenerative disease of the brain

---

[7] Dr. Hata's original report included an explanation of the "combination effects" of the medications. In that report, he stated that "[i]t is well understood in medicine that the use of Ativan, Phenergan and morphine when injected in close proximity of time raises unreasonable risk of synergistic reaction greatly exacerbating each of the drug's individual abilities to provoke respiratory depression and/or respiratory arrest." In that report Dr. Hata also expressly stated his opinion of what caused Mr. Constancio's death: "The injections of these three drugs increased the risk of somnolence and respiratory failure in this patient. It is my opinion that these medications given caused the patient's death due to the depression of his respiratory function." These statements were not included in Dr. Hata's second report.

caused by hypoxia. *See supra* note 4. The next sentence states that "[t]he patient died on 12/13/03." At a minimum, Dr. Hata's report ties the failure to diagnose hypoxemia to Mr. Constancio coding and showing no responsiveness after he coded. The majority concludes that this link is not sufficient to sustain appellant's claim. I disagree.

The report satisfies the standards required by the statute—"fair summary of the expert's opinions" and "objective good faith." Dr. Hata's report addresses all three statutorily required elements and states more than mere conclusions as to each element.[8] *See Palacios*, 46 S.W.3d at 878. It also explains the factual basis for Dr. Hata's statements, links his conclusions to the facts, and contains "sufficiently specific information to demonstrate causation beyond mere conjecture." *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52. The report links the alleged breaches of the standard of care to Dr. Bray's failure to diagnose hypoxemia and further links the failure to diagnose hypoxemia to Mr. Constancio's coding and showing no responsiveness after coding. The report therefore represents a fair summary of Dr. Hata's opinions. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). In addition, the report informs Dr. Bray of the specific conduct called into question and provides a sufficient basis to determine whether the claims have merit. *See Palacios*, 46 S.W.3d at 879. The report therefore also represents "an objective good faith effort to comply with the definition of an expert report." *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*), (r)(6).

---

[8] An expert report will necessarily include the conclusions of an expert. Problems with adequacy arise when the report states *mere* conclusions, such as a single statement that the breach of the standard of care caused the injury. These types of conclusory statements do not inform the defendant of the specific conduct called into question and do not provide a basis for the trial court to determine that the claims have merit. *See American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001).

11

Because the report provides a fair summary of Dr. Hata's opinions and represents an objective good faith effort to comply with the definition of an expert report, the trial court abused its discretion in granting Dr. Bray's motion to dismiss. I would reverse the trial court's order.

### *Extension of time*

With regard to the second issue, I agree with the majority that the trial court improperly calculated the period of time to cure the deficiencies of the first amended report, resulting in only a 7-day extension of the 120-day deadline for serving reports. Having exercised its discretion to grant an extension to cure a report it found deficient, the trial court does not have discretion as to the length of the extension. Section 74.351's plain language permits the court to grant "one 30-day extension to the claimant in order to cure the deficiency." *Id.* § 74.351(c); *Leland v. Brandal*, No. 06-1028, 2008 Tex. LEXIS 574, at *6-10 (Tex. June 13, 2008) (discussing 30-day extension); *Ogletree*, 2008 Tex. LEXIS 1028, at *7 (same). I therefore disagree with the majority's general remand. Because the trial court has exercised its discretion to grant an extension, but erred as to its length as the majority also seems to conclude, I would remand with instructions to grant "one 30-day extension."

### CONCLUSION

Because the second expert report proffered by Constancio satisfies the statutory requirements for an expert report and the trial court therefore abused its discretion in granting Dr. Bray's motion to dismiss, I would reverse the trial court's order. Alternatively, I would remand with instructions to grant the statutory extension.

12

_____

Jan P. Patterson, Justice

Before Justices Patterson, Pemberton and Waldrop

Filed:   September 5, 2008

13